Court. My name is Steve Maddox. I'm representing the appellant Barbara Laursen. Ms. Laursen is seeking a reversal of a denial of Social Security disability benefits, alleging an onset of disability in April of 1998 with an adverse hearing decision dated January of 2001. During the period that is covered by the onset date and the adverse hearing decision, she was between 50 and 52 and a half years old. The commissioner has concluded that Ms. Laursen has a combination of severe physical and psychological impairments and that these impairments significantly limit her ability to function and prevent her from performing any past relevant work. We're at step five with regard to the dispute. Dr. Gromko, her long-term treating physician, has consistently expressed his opinion that Ms. Laursen, because of the combination of her impairments, is not able to function in any kind of a work environment. I think the key question then is whether or not the ALJ rightfully rejected the treating physician's opinion. So why don't you tell us why you think that the ALJ did not? The ALJ agreed with Dr. Brani and Dr. Cole that a pain disorder existed, a pain disorder associated both with psychological factors and a general medical condition. But the ALJ did not take into account the pain disorder when assessing the residual functional capacity. And, in fact, relied on findings made that were essential to the pain disorder diagnosis when rejecting Dr. Gromko's testimony. Could you define for me what pain disorder is? It's a psychological impairment, is that right? It's a pain disorder. There are two types in the DSM-IV that the psychologists and psychiatrists use, and those pages are attached to the appendix. The first type is a pain disorder associated just with psychological factors. And in that situation, there's really nothing physically wrong with the patient, but they have a myriad of psychological symptoms which have a psychophysiologic cause. With regard to a pain disorder associated both with a general medical condition and psychological factors, both the medical conditions, and in this case, there's degenerative disc disease in the lumbar and cervical spine, status post-carpal tunnel syndrome, fibromyalgia, and other physical impairments. Those physical impairments have a prominent role in the pain, but also there are significant psychological factors which also essentially amplify the pain. But in order to make that... I understand. I interrupted you. I should let you answer this question. But in order to make that diagnosis, a clinician has to conclude that the patient is honestly reporting what they subjectively feel. Because in order to make that diagnosis, the clinician has to rule out malingering and rule out conscious symptom magnification. So, Ms. Larson has a pain disorder. When she gets examined, she has non-physiologic findings on examination. Her complaints are in excess of what would be expected given the objective medical findings. The question becomes, are those signs and symptoms, are they indicative of malingering or intentional symptom magnification, or are they the product of psychological factors beyond her control? And in order to diagnose a pain disorder, the clinician has to conclude that those symptoms are a product of psychological factors beyond her control. Both the psychologist and the psychiatrist made that diagnosis. The commissioner adopted that diagnosis, but then relies upon those same findings to say, well, she's not credible. And because she's not credible and because Dr. Gromko relied upon her subjective statements in his assessment, we can discredit his opinion. In fact, Dr. Gromko has about as much treatment experience with an appellant as you're likely to see. He saw her numerous times over a period of years. He made referrals to orthopedic surgeons. He made referrals to other orthopods. He made two different referrals to pain clinics by July. So, I mean, he had extensive experience with her. He saw her on a regular basis, and he concluded that she couldn't function. Well, you know, counsel, let me ask you this. There was one of the concerns that you have when you have a treating physician who is, as you have suggested, treated the same patient for many, many, many years. It has a close relationship with that patient, is that they may consciously or subconsciously lose some objectivity. I mean, they hear the patient say, I have pain, I have pain, I have pain, maybe hundreds of times, and they just simply assume that she has pain. Now, there was a board of examining physicians that apparently looked at her circumstances in some detail, and they concluded, apparently, that she was able to do several sedentary work jobs that did not require her to physically exert herself to the level which would have impeded her or caused her pain, even with her subjective symptoms. Now, so we have here a treating physician, we have here a board of examining physicians, both of which reach contrary conclusions, and the administrative law judge then makes a credibility determination. Are we supposed to say at this level, well, we'll just substitute our own judgment, we'll just do this de novo, and we'll decide that the ALJ just simply was wrong? That's what you're basically asking us to do, I think. The appellant has asserted and extensively briefed that issue, and the DLI report that you're speaking of was prepared in February of 1999, and there was a chiropractor, a neurologist, an orthopedic surgeon, or a neurosurgeon, and a psychiatrist on that panel. That's a pretty broad range of specialties, isn't it? Yes, it is, and the psychiatrist diagnosed a pain disorder. The physical doctors found significant pathology in her low back and her neck, but they were looking at whether or not to reopen a labor and industries claim, or to open a labor and industries claim, and they were only looking at something that was causally related to her industrial injury. The psychologist, Dr. Cole, in that panel indicated that, in his opinion, she was psychologically nonfunctional, but the psychological impairment was not found to be causally related to the industrial injury. But even if this court were to conclude that the panel exam was controverting Dr. Gromko in February of 1999, the claimants, the appellant's condition continued to deteriorate up to the date of the hearing decision. By the time of the administrative hearing, and really by November of 1999, she was essentially an invalid. She was receiving chore services to help her with her activities of daily living. She was getting help to get on and off the toilet and to have her food prepared and to have her home cleaned. I don't think there's any dispute that your client is not a well woman. I don't think that's the – I don't get from the ALJ's decision that the ALJ suggested that. I think – but the test is disability is defined as the inability to engage in any substantial gainful activity in any field. It's like a disability policy. I'm a federal judge, and before that I was a lawyer. And if I, for some reason, was unable to perform as a lawyer, I still couldn't collect on my disability policy if I could perform as a gardener. I mean, I think that's the point here. And the ALJ said, well, there are things like telephone soliciting and other things that she could do. Actually, Judge, that's not the case here. This case sits right on the equilibrium point between disability and non-disability. Because of her age and her vocational background, and because the administrative law judge and the commissioner have concluded she's limited to unskilled work, if she's limited to sedentary work, she's disabled under the medical vocational guidelines by rule. The residual functional capacity as assessed in this case is the absolute minimum upon which a denial could be based. If there's any – if the RFC is wrong at all in any significant way, it puts her into mandatory disability under medical vocational rule 201.17, I believe. It's in the brief under the medical vocational guidelines. So this isn't a situation because of her vocational profile and because of the rules applicable to social security disability. If she's limited to sedentary work, a finding of disabled is compelled here. And the administrative law judge acknowledged that in his decision, but he found her able to do a range of light work. But in order to do light work, she's got to be able to be on her feet six hours of an eight-hour day. Well, apparently a Mrs. Duncanson, who was your witness. Yes. In addition to testifying favorably for your client, also gave some testimony, excuse me, which wasn't so favorable, about some other things that she could do. And the ALJ found that that testimony was inconsistent with her being totally disabled. And I wasn't there. Her testimony is a matter of record, and it can be reviewed. There's no question Mrs. Duncanson was frustrated with Ms. Larson. She was living with her. She was caring for her. She was providing, and she was doing all this stuff for her, and she wanted her to try to do more. But if you look at what she said Ms. Larson was able to do, it's still way below the sedentary level. They talked about sometimes they would leave home for several hours and go into the community and go shopping. But when they returned, she'd have to go to bed. And that level of activity is not consistent even with sedentary activity, let alone light activity. You're a little bit over your time, but we'll give you a couple minutes for a moment or two. Good morning, Your Honors. David Johnson representing the Commissioner of Social Security, Joanne Barnhart. I wonder if I could just ask a question just directly now. It seems strange to me that the State of Washington is paying for someone to come in and keep house for Ms. Lawrence. And yet they're saying the vocational expert said she could do hotel maid work. It just seems totally inconsistent to me. Is there an answer to that? Well, part of the answer is that we've got two different sets of laws, two different governments, two different criteria. We don't know what the criteria are for the State of Washington to approve chore services. We do know, and this is what the ALJ decided the case on, what the Social Security Act requires for a finding of disability and the process that's set out in the regulations for establishing whether or not someone meets each of those criteria. Okay, well, I'll accept that answer, but let me then go ask, wouldn't she grid out if we found that under the medical vocational rule 201.14, if she were limited to sedentary work because of her age and accessibility? Isn't that true? That's correct, and that's in our brief. If she were limited to only sedentary work, she would be found disabled. If the grids were applicable, they are if she was limited to only sedentary work. But that really brings us to the crux of this case, and that is that it's not about the extremes. It's not about whether she's a malingerer or totally believable. It's not about whether she's limited to just sedentary or just light. It's about the fact that Ms. Larson's situation is unique, and the ALJ looked at all of the facts, the entire record, listened to the testimony, and made his decision that was somewhere in the middle. A very detailed residual functional capacity finding, a very thorough examination of the medical evidence, and she's What are the specific legitimate reasons he had for rejecting the testimony of the treating physician, Dr. Gromko? What were those specific reasons? Okay. To begin with, his opinions of complete disability is how Dr. Gromko generally described his opinion, were contrary to the panel examination, number one. So other examining physicians, they said that she could do light to sedentary work. It was contrary to Dr. Rani in examining, I believe, psychologists. Her evaluation that Plano could improve and manage her own pain is what Dr. Rani essentially concluded. It was contrary to the DDS physicians, the state agency reviewing physicians, who had the advantage over all the other physicians of looking at all of the evidence that was in the record collectively, and Social Security ruling 966P tells us they're experts in what Social Security disability law is in relation to medical considerations. But our case law fairly clearly addresses the fact that we have to give enormous weight to the treating physicians, and you can't simply reject the treating physician's opinion based on independent medical examination that's done for the purpose of determining disability. I recognize the force of your argument with these medical opinions, but it does seem in this case that everyone is quite clear that she is suffering real symptoms here. And even the lay testimony, which is one of the bases for rejecting the treating physician's testimony, is fairly explicit. She has no dexterity to her hands. She can't open jars. She can't sew. She can't, you know, it goes on and on. Her hands swell up for no reason. It really doesn't strike me, particularly given her age, that she's likely to get any job in the national economy. That is not the standard, of course. The standard is whether she's capable, and that's why also the ALJ included in the RFC limitations on no repetitive forceful gripping, no, well, no repetitive forceful gripping. He accounted for the credible limitations that the lay witness talked about. The lay witness also talked about the fact that she felt the claimant could do more than she was saying she could do. Now, this, of course, gets to the whole basis of a pain disorder. The key with the pain disorder here is that the diagnosis by itself does not immediately mean the plaintiff is entirely credible. And Dr. Cole, part of the panel examination, said that she had a mild pain disorder. We have to evaluate not just the diagnosis, but the degree to which the diagnosis actually affects the plaintiff. And in this case, it's mild. Category 2 under the Washington Administrative Code, which is cited by the plaintiff in the appendix, details that category 2 is mild. Drs. Cole and Ronnie, Dr. Ronnie also said that, and Dr. Van Dam agreed with that. So she has a pain disorder. She's not a well woman. Absolutely. Is there other work she could do? Apparently there is, and that's why. Counsel, I'm sorry to interrupt you, but I'll be candid with you. I mean, I think Judge Thomas just laid out some of the maladies that this woman suffers from. And I, in going through this record, when I read that there was a suggestion that she could be a hotel maid, struck me as just a little absurd. I mean, hotel maids have to wheel around heavy carts, change sheets, scrub floors. This woman is not, in this record, by admission of everyone, capable of doing any such thing. And then, of course, you've got this idea that she could be a telephone solicitor. And then you acknowledge that she can't have repetitive lifting and gripping. Well, okay, what about picking up and putting on a telephone? You know, even assuming that she was using a handset or a headset, there would still be a considerable amount of use of her hands, which, as Judge Thomas quite correctly pointed out, the record says, swell for no reason. I'm finding it very difficult to find the grip here for what you're arguing. I mean, I understand the suggestion that, you know, the standard here is that we review for substantial evidence. More than us until. Yes. So the ALJ has got a lot going for, I don't know whether it was a him or a her, I don't remember. I believe it was a him. A him, his decision. But on the other hand, I think it appears that the only reason that the treating physician's testimony was rejected by the ALJ is, quite frankly, he came to the conclusion that she was malingering, that she was exaggerating her complaints substantially, and that her primary treating physician's diagnosis was premised essentially on those exaggerated complaints. Am I right? No. Okay. Why not? Harmon tells us that the question of disability has a medical and a vocational component. And Dr. Gromko is qualified, both in his professional capacity and as far as the regulations allow him to be qualified, to give us an opinion about the medical situation. And he said she's completely disabled. So the ALJ needs to take that into account. But what does the other evidence also tell us? And I think the case law supports that examining physicians can be sufficient in and of themselves to rebut a treating physician's opinion. Didn't the reason that he discounted her treating physician, wasn't that because he found that it was premised, his opinion was premised upon her subjective complaints? That's part of the reason. It was almost the whole reason. No, it was contrary to the panel exam, contrary to Dr. Gromko. I pointed that out when, that's right. But in terms of just the credibility of his, just isolate the credibility of his statements, he found that they were premised upon her subjective complaints, which he found were exaggerated. Right? I believe so, yes. The ALJ found they were exaggerated. The ALJ used the other doctor's opinions to find that they were exaggerated, and exaggerated more than a mild pain disorder would account for. Additionally, he rejected Dr. Gromko's opinion because it was contrary to her demonstrated abilities. Dr. Gromko repeatedly stated that the plaintiff was completely disabled. And yet we know from plaintiff's testimony as well as Ms. Duncanson's testimony, that Ms. Duncanson would leave out food and the plaintiff would prepare her own breakfast and lunch meals. She would perform her own self-care. I'm not saying that that equates to being able to perform a full-time job needed at the ALJ, but it does show that Dr. Gromko's words were more exaggerated than we would use those terms in the social security context. And I agree with you that the equities of the case, when you initially read the statement of facts, you think, this woman can't work. But that's not the standard. The standard is, what do people who know about vocational requirements tell us? And the vocational expert testified that she can work. I believe it was The vocational expert said she could do hotel maid work, also said that she could do outsourcing work, but when she cross-examined, he admitted that she would have to go to a place and be in an office and sit down. He wasn't talking about outsourcing where she could be at home and take a nap and so forth when he was describing the several thousand jobs that were available. So aren't we able to look at what the vocational expert testifies and see if it makes any sense at all? Yes, absolutely. But if there's more than a scintilla, we need to adopt the ALJ's decision. There was also the job of cashier, and I believe, well, I have to look for sure. I think it was Nike. How could she be a cashier if she's got swollen, her hands are all swollen? I mean, don't you have to operate the cash register? I would believe you have to operate a cash register in most cashier positions. I understand that the standard is very high, but I don't think you have to be in intensive care in order to be totally disabled. I agree. But I don't think it was that she can't manipulate at all, and I don't think there's any basis for that kind of limitation in the record. It was that no repetible forceful gripping, opening jars, that sort of thing, is what was testified to, not that she can't do fine manipulations such as, I don't know, picking up the mail or writing a letter. That's not in the record. That's not a limitation that was evidenced. I must say the vocational expert's testimony was about the most casual I've seen in a Social Security case. It was almost, it was, usually you see a clear hypothetical and a rather detailed answer, but you get answers like, well, there's the cleaners, which is light and unskilled, but might need forceful gripping. I mean, it wasn't, I didn't find it particularly compelling. Not that that's a test. I'm just making an observation. I understand. Since plaintiffs stipulated that this was an expert, then no question, I would say there's more than a scintilla of evidence supporting the ALJ's decision. Thank you. Anything to add? Thank you for your arguments. The case just heard will be submitted. The next case on the oral argument calendar is Fang v. Ashcroft.
judges: D Nelson, Thomas, Ezra